UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:16-cr-00077-JAW |
| | ) | |
| MICHAEL VICENTE | ) | |

**ORDER AFFIRMING IN PART AND REJECTING IN PART THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE**

Mr. Vicente moves to suppress from evidence any statements he made during and following his arrest on September 7, 2016 contending that he made the initial statements without the benefit of a *Miranda* warning, which rendered the subsequent *Miranda* warnings ineffective. The Government maintains that because the initial statements were not the result of custodial interrogation, the warnings were effective and none of the statements is excludable.

The Magistrate Judge concluded that the officer's pre-warning questions fell within the routine booking exception to *Miranda* and recommended that the Court deny the motion to suppress in its entirety. After a de novo determination, the Court affirms the Magistrate Judge's recommended decision except with respect to the statements made about heroin in response to the officer's question of whether the defendant "took any drugs." The Court therefore denies in part and grants in part Mr. Vicente's motion to suppress.

**I.    PROCEDURAL BACKGROUND**

On June 8, 2016, a federal grand jury indicted Michael Vicente with one count of knowingly and intentionally conspiring with others to distribute and possess with

intent to distribute a mixture or substance containing oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1). *Indictment* (ECF No. 3). Mr. Vicente pleaded not guilty to Count One of the Indictment on October 6, 2016. *Min. Entry* (ECF No. 12).

On October 26, 2016, Mr. Vicente filed a motion to suppress any statements he made both before and after being advised of his *Miranda* rights on the date of his arrest. *Mot. to Suppress* (ECF No. 17) (*Def.'s Mot.*). On November 15, 2016, the Government objected to the Defendant's motion. *Gov't's Obj. to Def.'s Mot. to Suppress* (ECF No. 20) (*Gov't's Opp'n*).

The Magistrate Judge held an oral argument on the motion on January 11, 2017 and issued a recommended decision on February 7, 2017. *Min. Entry* (ECF No. 24); *Recommended Decision on Def.'s Mot. to Suppress* (ECF No. 25) (*Rec. Dec.*). On February 20, 2017, Mr. Vicente objected to the recommended decision. *Def.'s Obj. to the Magistrate Judge's Recommended Decision* (ECF No. 26). The Government responded to Mr. Vicente's objections on February 23, 2017. *Gov't's Resp. to the Def.'s Obj. to the Recommended Decision of the Magistrate Judge* (ECF No. 27).

## II.    PROPOSED FINDINGS OF FACT[1]

On September 7, 2016, at approximately 7:00 a.m., law enforcement officers knocked on the door of Mr. Vicente's residence in Thomaston, Connecticut. A woman answered the door. When the officers asked if Mr. Vicente was home, the woman

---

[1] At the January 11, 2017 hearing, the parties chose not to conduct an evidentiary hearing and agreed, for purposes of the motion, to the facts in the Drug Enforcement Agency (DEA) Report attached to the Government's opposition to the motion to suppress. *See Tr. of Proceedings, Mot. to Suppress* 8:11-9:4 (ECF No. 28) (*Tr.*); *see also Gov't's Opp'n* Attach. 1 *Report of Investigation* (*DEA Report*).

2

directed the officers to a first floor bedroom where Mr. Vicente was sleeping. One of the officers, Agent Nappi, recognized Mr. Vicente from a photograph he reviewed earlier. Agent Nappi handcuffed Mr. Vicente with his hands in front of him.

While in the bedroom, Mr. Vicente told the officers his name was "Michael," that he had been stabbed in the abdomen on the previous day but had left the hospital against medical advice, and that he was addicted to heroin.[2] When the officers

---

[2] The DEA Report, which serves as the factual record for the motion to suppress, did not state whether Mr. Vicente's statements were spontaneous and voluntary or in response to questions posed by the officers during the arrest. *See DEA Report* at 1–3. The parties have thus required the Court to decide whether there was an interrogation without clarifying whether the agents asked any questions and, if so, what the exact questions and responses were.

During the hearing before the Magistrate Judge on January 11, 2017, however, the Government explained that the relevant statements made by Mr. Vicente were in response to police questioning. *Tr.* 9:21-10:8. Still, over the course of the proceedings, the parties never established the officers' specific questions that elicited Mr. Vicente's responses. The Court therefore looks to the entire record, including the parties' briefs, to clarify this issue.

The Court infers from the record as a whole (and the parties do not dispute) that the officers first asked Mr. Vicente to confirm his identity or name. *Tr.* 9:25-10:1; *see also Gov't Opp'n* at 2. What is less clear is exactly what questions the officers asked to elicit the responses from Mr. Vicente that he "had been stabbed in the abdomen the previous day . . . and was very sore," that he "was in the hospital but left against the recommendation of the doctors," and that he "had an addiction to heroin and used approximately 1 to 2 grams of heroin per day." *See DEA Report* at 1–2.

At the hearing, the Government characterized the questions that elicited these responses as questions about Mr. Vicente's "medical condition." *Tr.* 10:1-2, 12:20 ("So he was asked his name, his medical condition"). The Government also provided what appears to be some hypothetical questions: "Are you uncomfortable? Are you hurt? Do you need help? I mean, what's wrong with you? Well, oh, I – I got stabbed in a family squabble." *Tr.* 12:16-18. However, based on the way the Government framed these questions in its argument, the references do not seem to be verbatim quotations of the actual questions asked of Mr. Vicente. In fact, in the Government's recitation of the facts in its opposition, it states that Mr. Vicente offered the statements about his pain and stabbing "*without* any questions being asked." *Gov't Opp'n* at 2 (emphasis supplied). The Court does not know quite what to make of these discrepancies. However, because Mr. Vicente never disputed the facts as laid out by the Government during the hearing, the Court will assume for purposes of this motion, as did the Magistrate Judge, that the officers asked general questions about Mr. Vicente's condition after he told them about the stabbing.

There is still one factual hole. During the hearing, the Government never touched on the particular question that elicited the statement about Mr. Vicente's heroin addiction and use. The Government's opposition provides some clarity. In the recitation of the facts, the Government asserts that the officers asked Mr. Vicente "if he took any drugs" after he expressed that he was in pain due to the stabbing. *See Gov't Opp'n* at 2. The Court assumes, for purposes of this motion, that the question that elicited the heroin response was whether Mr. Vicente took any drugs. If either the Government or Mr. Vicente wishes to place the exact question and answer sequence before the Court, it or he is free to move to do so.

3

noticed a cellular telephone on the bed next to Mr. Vicente, Mr. Vicente said the phone belonged to him.[3]

Two officers subsequently placed Mr. Vicente in a law enforcement vehicle to transport him to the local police station. On route to the police station, one of the officers read Mr. Vicente his *Miranda* rights. Mr. Vicente said he understood his rights and agreed to speak with the law enforcement officers. After arrival at the police station, Mr. Vicente was placed in an interview room where Mr. Vicente made other statements, including that "Warren" was probably responsible for his arrest, that he would "take care" of "Warren," that he only came to Maine to "get high," that he was not a large-scale drug distributor, and that he only sold oxycodone, which he obtained through a legitimate prescription.

## III. DISCUSSION

### A. Legal Standard

As the Magistrate Judge's Recommended Decision is on a motion to "suppress evidence in a criminal case," 28 U.S.C. § 636(b)(1)(A), this Court reviews the Recommended Decision de novo. 28 U.S.C. § 636(b)(1)(B); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation" on a dispositive motion).

---

[3] Originally, Mr. Vicente also sought to exclude evidence generated as a result of the search of a cell phone confiscated during the arrest. *Def.'s Mot.* at 2–3. As noted by the Magistrate Judge, the Government reported that the law enforcement officials did not search the phone and arranged for the return of the phone to Mr. Vicente, so Mr. Vicente withdrew this portion of his motion. *See Tr.* 6:9-11. Therefore, for the reasons stated by the Magistrate Judge, the Court does not reach any of the issues regarding the cell phone, including Mr. Vicente's statement claiming ownership of the phone.

4

### B. Pre-*Miranda* Statements

The Magistrate Judge concluded that Mr. Vicente was not subject to interrogation when asked to confirm his identity and when asked about his health because these questions "are not the type that would typically prompt an incriminating statement." *Rec. Dec.* at 7. The Court agrees with the Magistrate Judge's conclusions as to the questions regarding Mr. Vicente's name and health condition but concludes that the question regarding Mr. Vicente's drug use was interrogation.

*Miranda* warnings are required prior to any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 473–79 (1966); *United States v. Molina–Gómez*, 781 F.3d 13, 21–22 (1st Cir. 2015). Custodial interrogation requires that the defendant was both "in custody" and subjected to "interrogation." *United States v. Jackson*, 544 F.3d 351, 356 (1st Cir. 2008). As pointed out by the Magistrate Judge, neither side disputes that Mr. Vicente was in custody at the time of his arrest. They argue over whether the law enforcement officers' questions pre-*Miranda* warnings constituted an interrogation.

An interrogation for *Miranda* purposes includes "any words or actions on the part of the police (other than those normally attendant on arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). An exception exists for routine booking questions seeking background information, such as the "suspect's name, address, and related matters." *United States v. Sanchez*, 817 F.3d 38, 44–45

(1st Cir. 2016) (citing *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989)); *see also United States v. Reyes*, 225 F.3d 71, 76–77 (1st Cir. 2000) (noting that questions asked at booking regarding defendant's date of birth and social security number fit within the purview of this exception, given the circumstances of the case). The rationale behind the booking exception is the idea that questions of this sort "rarely elicit an incriminating response . . . even when asked after an arrest." *Sanchez*, 817 F.3d at 45 (citing *Doe*, 878 F.2d at 1551); *accord Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (noting that the booking exception "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services") (internal quotations omitted).

There is, however, an exception to the exception: the booking exception does not apply "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate." *Sanchez*, 817 F.3d at 45 (quoting *Doe*, 878 F.2d at 1551). Ultimately, the booking exception's applicability turns on an objective test that asks "whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response." *Reyes*, 225 F.3d at 77. The officer's actual belief or intent, though relevant, is in no way conclusive. *Sanchez*, 817 F.3d at 45 (internal quotations omitted). To assess whether a question fits within the routine booking exception, the First Circuit has looked to factors such as whether the questions were routine or standard non-investigatory procedure, whether the officers who asked the initial questions and whether the location were the same as in any subsequent substantive

interrogation, and whether the questions are linked or tied to the suspected criminal activity. *See Sanchez*, 817 F.3d at 45–46; *Reyes*, 225 F.3d at 77.

The Magistrate Judge correctly concluded that the attempt by law enforcement officers to confirm Mr. Vicente's identity by asking his name can reasonably be considered routine. *See Rec. Dec.* at 7. This is exactly the kind of question to which the routine booking exception to *Miranda* was intended to apply. *See Muniz*, 496 U.S. at 601 (holding that questions concerning suspect's name, address, height, weight, eye color, date of birth, and current age were not interrogation because they are "biographical data necessary to complete booking or pretrial services"). The officers had no reason to believe that asking Mr. Vicente to confirm his identity to ensure they had the right person would elicit an other than routine response.

The Magistrate Judge also concluded that "[s]imilarly, questions about Defendant's health, as an officer was placing Defendant in handcuffs, are reasonable to assure Defendant has no health concern that might be affected by the handcuffing process" and "are not the type that would typically prompt an incriminating statement." *Rec. Dec.* at 7. To the extent that the officers asked questions about Mr. Vicente's physical and medical condition, specifically about his pain and the stabbing injury, the Court agrees that Mr. Vicente was not subject to interrogation. As noted by the Magistrate Judge, courts have applied the routine booking exception to questions about an arrestee's health or the nature and extent of a medical condition. *See United States v. Bishop*, 66 F.3d 569, 572 n.2 (3d Cir. 1995) (holding that question regarding arrestee's limp was part of the routine booking procedure); *United States*

7

*v. Farlee*, 910 F. Supp. 2d 1174, 1181 (D.S.D. 2012) (holding that questioning about what happened to an arrestee's arm after the arrestee brought attention to it was not interrogation); *United States v. Linderman*, No. 07-359, 2008 WL 199913, at *3 (D. Minn. Jan. 22, 2008) (holding that questioning about arrestee's mental and physical health was not interrogation); *United States v. Donaldson*, No. 4:10-CR-047-01-HLM, 2011 WL 1597685, at *8 (N.D. Ga. Apr. 26, 2011) (holding that questioning about HIV when arrestee looked yellow was not interrogation). These courts reasoned that questions about health conditions are "designed to fulfill the government's obligation to provide medical attention if necessary." *See, e.g.*, *Bishop*, 66 F.3d at 572 n.2.

However, the officer's question of whether Mr. Vicente "took any drugs" is different from questions assessing the extent and nature of his stabbing injury. Unlike general questions about his medical condition, which were unlikely to elicit an incriminating response and therefore fit more comfortably within the routine booking exception to *Miranda*, the Court does not consider the question of whether Mr. Vicente took any drugs to be "facially neutral." *See United States v. Hopkins*, No. 04-135-P-H, 2005 WL 1176576, at *6 (D. Me. Apr. 5, 2005) (stating that inquiry into whether the arrestee "had any medical condition of which jail personnel should be aware" was facially neutral).

More on point, in 2005, this District addressed whether questions regarding drug usage fall under the routine booking exception. In *United States v. Hopkins*, a judge in this District denied a motion to suppress statements provided in response to routine booking questions regarding drug use. 2005 WL 1176576, at *7. In reaching

8

its conclusion that the drug usage question was not an interrogation, the *Hopkins* Court observed that the inquiring officer followed a script, was not a part of the investigation, and had no reason to believe that the questions would yield responses relevant to the charges on which the arrestee was detained (failure to appear and operating after suspension). *Id.* at *6.

Applying these same factors to this case, the Court concludes that the question of whether Mr. Vicente took any drugs does not fit within the purview of the routine booking exception. First, there is no evidence in the DEA Report that the inquiring officer was following a script or completing a routine booking interview, as in *Hopkins*.

Second, the same officers who asked Mr. Vicente whether he took any drugs conducted the subsequent substantive investigatory interrogation, and at that interrogation again elicited information from Mr. Vicente about his use of drugs, although this time Mr. Vicente discussed his use and distribution of oxycodone, not heroin. At the same time, the subsequent interrogation was different in substance and conducted in a different location. Therefore, this factor sheds little light on the analysis of whether the drug usage question was "investigatory."

Third, on September 7, 2016, the officers arrived at the Connecticut residence where Mr. Vicente was staying in order to execute a federal arrest warrant resulting from an indictment in Maine. *DEA Report* at 1 ("VICENTE was the subject of a Federal Arrest Warrant issued in the District of Maine"). The indictment upon which the arrest warrant was based charged Mr. Vicente with engaging in a conspiracy to

9

distribute oxycodone. *Indictment* (ECF No. 3). As the First Circuit explained in *Reyes*, the issue is "whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response." *Reyes*, 225 F.3d at 76–77.

To ask Mr. Vicente, who is under indictment for distribution of a prescriptive medication, whether he had taken any drugs is, from this Court's perspective, too close to an investigation of the pending charge to be permissible. Although the chronology is not entirely clear, the DEA Report indicates that the officers came upon Mr. Vicente in a bed at the residence, that they identified him as Michael Vicente, that he told them that he had been involved in a family squabble and had sustained a stabbing wound to his abdomen, that he had been in a hospital but left against medical advice, and that he had shown the officers the stomach wound. *DEA Report* at 1–2. In these circumstances to ask Mr. Vicente whether he had taken any drugs could well have elicited an incriminating response. In fact, in response to this question, Mr. Vicente admitted not only that he was addicted to heroin but also that he was using one to two grams of heroin per day. *Id.* at 2. To place this question in perspective, during the post-*Miranda* interrogation at the police department, Mr. Vicente told the agents that he "only sold oxycodone which he (VICENTE) obtained from a legitimate prescription." *Id.* at 2. Thus, although Mr. Vicente did not say that he had ingested oxycodone, an opiate-based prescriptive medicine, he did admit that he was addicted to and had ingested heroin, an opiate-based drug.

10

The Government explains that the officers asked the question to "determine the defendant's medical situation following his initial expression of physical discomfort when arrested." *Gov't's Opp'n* at 3; *Tr.* 10:1-7 (stating that the officers were questioning Mr. Vicente about his medical condition because they "want to make sure that they're not taking somebody to jail who should first go to the hospital, be medically cleared to be brought to jail"). This is a fair point. As previously discussed, it is not entirely clear from the record whether the officers asked if Mr. Vicente took any drugs in the midst of a series of other questions about Mr. Vicente's condition, which would make it more likely that this question was intended to determine whether Mr. Vicente needed to go to the hospital, to take medication for the pain, or to alert the jailers to any unusual medical needs, such as opiate withdrawal. Nonetheless, even assuming the true intent behind the question about drugs was to determine whether medical attention was necessary, the officer's actual subjective intent, though relevant, is not dispositive. *See Sanchez*, 817 F.3d at 45. At bottom, the test is an objective one and here, given the circumstances, the officer "should have reasonably expected the question to elicit an incriminating response." *See Reyes*, 225 F.3d at 77.

Finally, if the agents were interested in learning about his drug use for potential medical reasons, when they learned from Mr. Vicente that he was addicted to heroin and used approximately one to two grams of heroin per day, they did not take Mr. Vicente to the hospital. They took him to the police station, where they

further interrogated him, and then brought him directly to the U.S. Marshals for transportation to the District of Maine.

In the Court's opinion, this is not a case where the inquiring officers had no reason to know that the question was even tangentially related to an issue in the investigation. *See, e.g.*, *United States v. Gill*, 879 F. Supp. 149, 152 (D. Me. 1995) (holding that question about place of birth was not interrogation because corporal did not know that place of birth would have any relevance to investigation regarding possession of a license). As the question about drugs was asked by DEA agents investigating a drug conspiracy, the situation is more akin to the cases in which the routine booking exception did not apply because the questions related to the suspected charges. *See, e.g.*, *Doe*, 878 F.2d at 1551–52 (holding that question about citizenship on high seas of person present on foreign vessel with drugs is reasonably likely to elicit incriminating response).

The Court acknowledges that this is a close case. In general, to ask a person who had just awakened, had suffered a knife wound to the abdomen, and had left a hospital against medical advice whether he had taken any drugs would not on its face violate the person's rights. It is possible that the Government could justify the question based on facts not a part of this record.[4] However, given all of the circumstances revealed in this record, the Court concludes that the question of

---

[4] For example, if the record revealed that Mr. Vicente appeared groggy or in extreme pain, if the questions were pursuant to a standard police protocol, if law enforcement had been in contact with emergency medical personnel who had asked the agents to ask the question, or if law enforcement had brought Mr. Vicente to the emergency room before taking him to the police station, the question about drug use would be objectively more reasonable.

whether Mr. Vicente "took any drugs" was an interrogation, and the Court therefore suppresses Mr. Vicente's response that he has an addiction to heroin and takes one to two grams of heroin per day. The Court does not, however, suppress any of the other statements made during the arrest pertaining to Mr. Vicente's name or the stabbing injury.

### C. Midstream *Miranda* Warnings

Mr. Vicente also argues that because he was subject to custodial interrogation without the benefit of the *Miranda* warnings during the arrest, the subsequent *Miranda* warnings given in the vehicle on the way to the police station were ineffective, and therefore all of his statements made after the warnings should be excluded. Although the Magistrate Judge concluded that none of the pre-*Miranda* statements was in response to custodial interrogation, he noted that even if they had been, the subsequent *Miranda* warnings were effective as to the statements made by Mr. Vicente following the warning. *Rec. Dec.* at 7. Applying the factors laid out in *Missouri v. Seibert*, 542 U.S. 600, 615 (2004), the Magistrate Judge concluded that because the subject matter of the questions at home was substantively different from the questions after the *Miranda* warning, the location of the sets of questioning was significantly different, and the subsequent questioning was more extensive and more detailed, the warnings were effective. *Rec. Dec.* at 8–9. The Court agrees with the Magistrate Judge for all of the reasons set forth in his recommended decision.

The Court adds that this conclusion is further supported by the fact that the one pre-*Miranda* warning question that the Court concluded constituted

13

interrogation, whether Defendant took any drugs, was made in response to Mr. Vicente's own statements about his injury. This cuts against any suggestion that the police "deliberately employ[ed] a sequence of unwarned questioning producing disclosures, followed by *Miranda* warnings, followed closely by similar questioning." *See United States v. Rogers*, 659 F.3d 74, 80 (1st Cir. 2011) (Souter, J.) (citing *Seibert*, 542 U.S. at 620–21 (Kennedy, J., concurring)). Additionally, given the fact that all of the other questions asked by the officers at the home fell into the routine booking exception, this situation is more like one in which the officers merely failed to advise a defendant of his *Miranda* rights. *See United States v. Marenghi*, 109 F.3d 28, 31–32 (1st Cir. 1997). In these instances, where no coercive tactics are employed, a statement is admissible under the general standard, so long as "it was obtained after the defendant: (1) was advised of his or her *Miranda* rights; and, (2) knowingly and voluntarily waived those rights." *Id.* at 32 (citing *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)). There is no evidence in the record to contradict, and the parties do not dispute, that Mr. Vicente's waiver after the *Miranda* warnings was voluntary and knowing. Therefore, the Court concludes that Mr. Vicente's post-*Miranda* statements are not excludable.

## IV. CONCLUSION

The Court REJECTS in part and AFFIRMS in part the Magistrate Judge's Recommended Decision on the Defendant's Motion to Suppress (ECF No. 25). It rejects the recommendation as to the Defendant's statements regarding his heroin addiction and use and affirms the recommendation as to all other statements made

14

by the Defendant on September 7, 2016.  Accordingly, the Court GRANTS in part and DENIES in part Mr. Vicente's Motion to Suppress (ECF No. 17).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 19th day of April, 2017